UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at GREENEVILLE

| KARIM EL-AMIN | ) | |
|---|---|---|
| | ) | |
| v. | ) | NO. 2: 09-CV-273 |
| | ) | |
| WASHINGTON COUNTY DETENTION | ) | |
| CENTER, SHERIFF ED GRAYBEAL, | ) | |
| LT. EDEN #368, SGT. POWEL #224, | ) | |
| C.O. FRAME #638, *et al.* | ) | |

**<u>MEMORANDUM and ORDER</u>**

Acting *pro se*, state prisoner Karim El-amin brings this *pro se* civil rights complaint for injunctive and monetary relief under 42 U.S.C. § 1983, alleging that his constitutional rights were violated while he was housed in the Washington County Detention Center [WCDC].[1]

**I.** *Filing Fee*

Plaintiff's application to proceed *in forma pauperis* is **GRANTED**. [Doc. 3]. However, since plaintiff is a prisoner, he is **ASSESSED** the full filing fee of three hundred, fifty dollars ($350.00). 28 U.S.C. § 1914(a). The custodian of

---

[1] At the time the action was filed, plaintiff was confined in the Morgan County Correctional Facility in Wartburg, Tennessee, and though he was returned to the Washington County Detention Center temporarily, he was transferred back to MCCF shortly thereafter. [Doc. 2, Attach. 1 and 2; Doc. 7, Attach. 1; and Doc. 8, Attach. 1].

plaintiff's inmate trust account at the facility wherein he currently resides shall submit, as an initial partial payment, whichever is the greater of: (a) twenty percent (20%) of the average monthly deposits to plaintiff's inmate trust account; or (b) twenty percent (20%) of the average monthly balance in his inmate trust account for the six-month period preceding the filing of the complaint. 28 U.S.C. § 1915(b)(1)(A) and (B).

Thereafter, the custodian shall submit twenty percent (20%) of plaintiff's preceding monthly income (or income credited to his trust account for the preceding month), but only when such monthly income exceeds $10.00, until the full filing fee has been paid to the Clerk's Office. *McGore v. Wrigglesworth*, 114 F.3d 601, 607 (6th Cir.1997), *overruled on other grounds by Jones v. Bock*, 549 U.S. 199 (2007).

All payments should be sent to: Clerk, USDC, 220 West Depot Street, Suite 200, Greeneville, TN 37743. To ensure compliance with the fee-collection procedure, the Clerk is **DIRECTED** to mail a copy of this memorandum and order to the custodian of inmate trust accounts at the prison where he now resides and to Gayle Ray, Commissioner of the Tennessee Department of Correction.

## II. *Screening*

The Court now must screen the complaint to determine whether it should

2

be dismissed as frivolous, malicious or for failure to state a claim or because monetary damages are sought from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2) and § 1915A. For ease of discussion, the claims have been divided into categories.

A. **Claims against WCDC**

The first defendant named in the complaint is the Washington County Detention Center. However this defendant is a non-suable entity because it is a building and not a "person" within the meaning of § 1983. *Monell v. Department of Social Services*, 436 U.S. 658, 688-90 (1978); *Cage v. Kent County Correctional Facility*, 1997 WL 225647, **1 (6th Cir. May 1, 1997). Plaintiff has failed to state a § 1983 claim against the WCDC.

B. **Claims based on Respondeat Superior**

Plaintiff maintains that defendant Sheriff Ed Graybeal, as the Chief Administrator of the Washington County Sheriff's Department, has a duty and responsibility to oversee the everyday operations of the WCDC, that he must ensure that his subordinates are fair and impartial and that they adhere to the WCDC's policies and procedures, and, thus, that defendant sheriff must be held liable for any breach or violation of the rights of inmates by any of his officers.

Clearly, plaintiff is seeking to impose supervisory liability on defendant sheriff. However, this theory is unworkable in this particular lawsuit because § 1983 liability must be based on more than respondeat superior, or a defendant's right to control employees. *Taylor v. Michigan Dep't of Corrections,* 69 F.3d 76, 80-81 (6th Cir. 1995); *Hays v. Jefferson County, Ky.*, 668 F.2d 869, 874 (6th Cir. 1982). While a supervisor can be held liable if he plays an active role in the alleged misconduct, no liability attaches if he merely fails to act. *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). Also, plaintiff must establish the personal involvement of each defendant in the supposed constitutional deprivation. *Dunn v. State of Tennessee*, 697 F.2d 121, 128 (6th Cir. 1982) .

Absent some concrete showing that defendant sheriff authorized, approved, or knowingly acquiesced in the alleged wrongful conduct of his subordinates, plaintiff has failed to state a § 1983 claim against him. *Walton v. City of Southfield,* 995 F.2d 1331, 1340 (6th Cir. 1993); *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). Sheriff Graybeal is **DISMISSED** as a defendant in this lawsuit.

C. **Conspiracy Claims**

   1. Allegations

4

Plaintiff alleges that, in the evening of August 26, 2009, defendants Lieutenant Eden, Sgt. Powel, and C. O. Frame conspired to deny him his rights under the First, Fourth, Eighth, and Fourteenth Amendments by obstructing his right to freedom of religion and to humane, impartial and/or equitable treatment. The conspiracy was designed to cause plaintiff "undue, sociological and psychological anguish" and, potentially, "physical and/or bodily harm."

Plaintiff, as an adherent to the Islamic faith, is required to pray no less than five time a day and to fast on specified days during the month of Ramadan. In 2009, Ramadan began on August 22nd. For four and a half months previously, plaintiff had been praying outside the visiting gallery in his B-3 housing unit. This designated area allowed him to remain within the line of vision of the pod officer. However, on August 23, 2009, plaintiff was told that he could no longer use the designated area but instead would have access to the utility room where mattresses and boats (temporary floor bunks) were stored.

For two and a half days, plaintiff prayed in the newly designated area, though he noted that other inmates were allowed access to the same area denied him and that arrangements were made to accommodate activities, such as Alcoholics Anonymous, Narcotics Anonymous, and Bible study, in the outside recreation yard

or, in case of rain, "upstairs, near the visiting gallery." On August 25, 2009, plaintiff filed a request form addressed to a Captain Lowe, asking for a meeting to discuss the situation. Though the average response time is three to four days, the next day, plaintiff received a response—from defendant Powel, not Captain Lowe—indicating that the two officers would look into the matter and get back to him several days later.

At 8:00 p.m. that day (i.e., August 26th), plaintiff asked defendant Frame for access to the utility room to pray, defendant told him that he would no longer be allowed access to that room. Although plaintiff protested that the last two shifts of officers had allowed him to pray in the utility room and although he explained about the response to his earlier request for a meeting, defendant Frame remained adamant.

Plaintiff then asked defendant for a request form. Defendant Frame refused to issue one, stating that he had been given explicit orders not to call either Sgt. Powel or Lt. Eden and/or issue plaintiff a request form regarding the "prayer issue." Plaintiff next asked for a grievance form, which prompted defendant Frame to call defendant Powel whom, defendant Frame related, had said that plaintiff would not be issued a request form or a grievance form. Plaintiff responded with a request that defendant Frame enter defendant Powel's response in the pod's log book, which

apparently this defendant did.

At this point, plaintiff stated to defendant Frame that he still needed a place to pray. Defendant Frame became indignant and profane and told plaintiff that he did not care where or if he prayed, but that he only knew that, on his watch, "it wasn't going to be upstairs or in the f_ _ _ ing utility room." Ironically, during this exchange about prayer, plaintiff could hear and see inmates gambling—an infraction of the WCDC rules of inmate conduct.

Plaintiff moved to a spot in front of the "yellow line" outside of the officer's post (the cage), where inmates were supposed to stand when addressing the pod officers, and began his prayer. Defendant Frame came running out of the cage and yelled at plaintiff to "stop praying" and that he was giving him a direct order to cease, at once, with the praying. Plaintiff did not acknowledge this order because it is superceded, in his estimation, by Allah's orders to perform prayers five times a day. Plaintiff completed his prayer, and defendant Frame instructed him to pack his belongings because he was going to segregation.

Plaintiff was escorted to the segregation unit and entered Cell # 4, which was occupied by a federal inmate named Huddle. Inmate Huddle told plaintiff he was a White Supremacist, that he did not like either n_ _ _ _ _ _ or Muslims, and that, if

7

plaintiff even tried praying, he would "kick [his] a\_ \_." It was obvious to plaintiff that rumors of his chosen religion had preceded him to the segregation unit, that the entire sequence of events that evening had the stench of a set-up, and that defendant Eden and his cronies had arranged the whole scenario. At some point, a correctional officer brought to plaintiff's cell a boat, a mattress, and plaintiff's personal possessions. This too was suspicious to plaintiff because Cell # 4 had an empty bunk and because there was no need for a boat in that cell.

Plaintiff exited the cell to explain his dilemma to the officer who then, plaintiff believes, triggered a code because five officers responded. They came straight to plaintiff and one officer asked, in a very hostile, somewhat violent tone, what the problem was. Another officer told plaintiff that either he stayed in Cell # 4 with inmate Huddle or he and the other officers would physically place him in a P.C. (protective custody) cell. Inmate Huddle interjected that if plaintiff were placed in the cell with him that he (Huddle) would not be responsible for what would take place and that he "had just got one of them (meaning Blacks) out of his cell."

Plaintiff again asked for a grievance and again was denied one. He was then placed in Cell # 8 with two other inmates who had asked for protective custody because of the nature of their offenses. Therefore, unlike Cell # 4, Cell # 8 required

a boat so that plaintiff could sleep. Also, one of the inmates had what was believed to be a staph infection because a nurse had to drain a swollen area on his back every day and replace the bandage. Plaintiff alleges that placing him in Cell # 8 could only be construed as racial favoritism, implying that inmate Huddle, though he was already occupying the cell, is the one who should have been required to leave his cell and go to Cell # 8.

2. Law & Analysis

A civil conspiracy, as explained by the Sixth Circuit, "is an agreement between two or more persons to injure another by unlawful action. *Spadafore v. Gardner,* 330 F.3d 849, 854 (6th Cir. 2003) (citing *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985)). Here, plaintiff claims that a conspiracy to violate his rights existed, but he has not provided any facts to show that there was "a meeting of the minds" between two or more defendants as to *one* plan to violate his constitutional rights. *Id.* at 854. The factual allegations provided and the reasonable inferences to be drawn thereof simply do not link defendants "to any common act designed to deprive [plaintiff] of [his] constitutional rights." *Michigan Paytel Joint Venture v. City of Detroit,* 287 F.3d 527, 541 (6th Cir. 2002). Even if the Court assumes that all the conduct occurred as alleged in the complaint, "there is no evidence from which to

infer that the defendants acted in concert in so doing." *Spadafore*, 330 F.3d at 854.

Moreover, a plaintiff must assert with a degree of specificity explicit acts in which defendants engaged which were reasonably connected to the furtherance of the purported conspiracy; allegations of a conspiracy premised upon mere conclusions and opinions, as are these, need not be accepted as true and, thus, fail to state a claim. *Gutierrez v. Lynch,* 826 F.2d 1534, 1538-39 (6th Cir.1987) (holding that vague, conclusory accounts of a conspiracy and unconstitutional behavior are insufficient to state a civil rights claim). Plaintiff's assertion of the existence of a civil conspiracy lacks merit, is conclusory, and fails to state a § 1983 claim for relief.

C. **Housing Condition Claims**

Plaintiff's final set of claims involve general conditions at the WCDC such as alleged deficiencies in medical care, legal process, space (due to overcrowding), provision of hygiene items (toilet paper), due process protections and numerous other unidentified inhuman conditions.

With the possible exception of one claim, plaintiff has not indicated how these alleged deprivations or conditions have caused him personal injury. This failure implicates the standing doctrine, which derives from Article III's restriction of federal court jurisdiction to "cases and controversies." U.S. CONST. art. III, § 2, cl.1. To

show that he has standing, a plaintiff must demonstrate three things: (1) an injury in fact or a harm that is "actual or imminent, not conjectural or hypothetical," (2) causation, and (3) redressability. *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (citations omitted).

Absent a plea of personal harm, plaintiff has failed to satisfy the first element. Therefore, plaintiff has failed to show that he has standing to pursue the claims which allege harm to the general population of inmates but none specific to himself. *See ACLU v. Nat'l Sec. Agency*, 493 F.3d 644, 659 (6th Cir. 2007) (observing that the standing doctrine "applies to every claim sought to be litigated in federal court").

As noted, plaintiff has standing as to one claimed unconstitutional condition—an insufficient supply of toilet paper—because he maintains that he was affected personally by this condition. According to plaintiff, each WCDC inmate is given one roll of toilet paper per week and, if that runs out, additional toilet paper will be supplied upon request. Plaintiff made one such request and was furnished only three sheets of toilet paper, and the officer who brought it to the cell stated that two of those were for plaintiff's cell mates.

The Court is not aware of any constitutional minimum amount of toilet

paper that must be furnished to inmates, but it is aware that the length of time that an inmate is subjected to certain conditions of confinement is relevant in determining whether the confinement meets constitutional standards. *Hutto v. Finney*, 437 U.S. 678, 686-87 (1978) ("A filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months."); *Holloway v. Gunnell*, 685 F.2d 150, 156 (5th Cir. 1982) ("allegations of two days of discomfort are not sufficient to state a claim of constitutional dimension"). While plaintiff may have suffered discomfort on one occasion by being furnished with such a stingy quantity of toilet paper, he does not allege that he was totally deprived of toilet paper, which, presumably, is an item of hygiene which is among life's basic necessities.

Even if standing were not at issue (which it is not in the toilet-paper claim), plaintiff's allegations fail to state a claim for relief. For example, plaintiff's contention that the WCDC authorities are slow to respond to grievances fails to state a claim for a constitutional violation since there is no constitutional right to a grievance procedure. By the same token, plaintiff's contention that, due to the WCDC's unwritten rules and regulations, inmates are denied the right to participate in the "Legal Process," including consultation about legal matters and access to legal materials, fails to state a claim because he has not shown that, as a result of those rules

and regulations, he has actually been impeded in his efforts to pursue a non-frivolous legal claim regarding his conviction or conditions of confinement. *Lewis v. Casey*, 518 U.S. 343, 351 (1996).

As to the other allegations of unconstitutional conditions, prison officials must provide humane conditions of confinement, including "adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.)." Overcrowding in and of itself is not necessarily unconstitutional, but if overcrowding causes an inmate to be denied the minimal civilized measure of life's basic needs, such as food, warmth, or exercise, this would transgress the Eighth Amendment. *Wilson v. Seiter*, 501 U.S. 294, 298, 304 (1991). An Eighth Amendment violation also results when prison officials exhibit deliberate indifference to an inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

An Eighth Amendment claim is composed of two parts: an objective component, which requires plaintiff to show a "sufficiently serious" deprivation, and a subjective component, which requires a showing of a sufficiently culpable state of mind —one of deliberate indifference. *Farmer*, 511 U.S. at 842. Deliberate

indifference is illustrated by a prison official who acts or fails to act despite knowledge of a substantial risk of serious harm to an inmate under his care. *Id*.

To satisfy the subjective component, a plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer a substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk. *Id.,* at 837. Plaintiff " bears the onerous burden of proving the official's subjective knowledge . . . . " *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).

Assuming, but not finding, that plaintiff's allegations satisfy the objective element of a confinement conditions claim, he has made no contentions of fact tying any of these defendants to the alleged unconstitutional conditions, and, without some factual nexus between the alleged improper conditions and each defendant, there is nothing from which to infer the state-of-mind element of an Eighth Amendment claim. Absent any contention that these defendants knew about and disregarded a substantially serious risk posed by plaintiff's housing conditions or medical care, he has failed to satisfy the "deliberate indifference" element of an Eighth Amendment claim.

### III. *Conclusion*

For all these reasons, this action will be **DISMISSED** for lack of

standing and for failure to state a claim entitling plaintiff to relief under 42 U.S.C. § 1983.  Given the Court's disposition of this case, plaintiff's motions for a default judgment and to appoint counsel are **DENIED** as **MOOT**.  [Docs. 5, 7].  Finally, plaintiff's motion for a writ of mandamus, under 28 U.S.C. § 1361, is inappropriately filed in this Court because that statute authorizes district courts to entertain a suit in the nature of mandamus to compel a federal officer, employee, or agency to perform a duty owed to a plaintiff and because plaintiff seeks to compel the prosecution or the trial judge—neither of whom is a federal official—to act in his pending state judicial criminal proceedings.  It likewise is **DENIED** for lack of jurisdiction.  [Doc. 8].

    A separate order of dismissal will enter.


**ENTER**:


                                              s/J. RONNIE GREER
                                    UNITED STATES DISTRICT JUDGE